CHERYL MARTIN BURROW v. RANDOLPH COUNTY BOARD OF EDUCA-
TION

No. 8219SC356

(Filed 19 April 1983)

1. **Schools § 13.2— dismissal of career teacher—plea of no contest to involuntary manslaughter in shooting death**

   A career teacher who had pleaded no contest to involuntary manslaughter in the shooting death of her husband and who would have been on work release or parole while teaching was properly dismissed from employment by a county board of education pursuant to the provisions of former G.S. 115-42(e)(1)k (now G.S. 115C-325(e)(1)k), which provides for the dismissal of a career teacher for any cause which constitutes grounds for the revocation of the teacher's teaching certificate, and pursuant to the provisions of 16 N.C. Administrative Code, Sec. 2H.0224(a)(3), which provides for dismissal upon the entry of a plea of *nolo contendere*, as an adult, to a crime when there is a reasonable and adverse relationship between the underlying crime and continuing ability of the person to perform any of his or her professional functions in an effective manner.

2. **Estoppel § 5.1; Schools § 13.2— dismissal of career teacher—application of N.C. Administrative Code—no estoppel of board of education**

   A county board of education was not estopped from applying provisions of the N.C. Administrative Code in dismissing a career teacher who pleaded no contest to involuntary manslaughter in the shooting death of her husband on grounds that she had no notice that the board would rely on the provisions of the Administrative Code and that she entered her plea of no contest because of a letter from the board's counsel to her counsel concerning the adoption of and applicability of such provisions of the Administrative Code, since an estoppel of the board under such circumstances might impair the board's exercise of its governmental powers, and since the board cannot be held responsible for the civil consequences of the teacher's voluntary plea of no contest entered in the criminal court or for any information or advice which may have been given the teacher by any agent of the board.

APPEAL by plaintiff from *Hairston, Judge.* Judgment entered 13 November 1981 in Superior Court, RANDOLPH County. Heard in the Court of Appeals 15 February 1983.

*Robert R. Schoch for plaintiff appellant.*

*Moser, Ogburn, Heafner & Miller by Michael C. Miller and William H. Heafner for defendant appellee.*

*Chambers, Ferguson, Watt, Wallas, Adkins & Fuller by James C. Fuller, Jr., for North Carolina Association of Educators, amicus curiae.*

*George T. Rogister, Jr., Elizabeth F. Kuniholm and Ann L. Majestic for North Carolina School Boards Association, Inc., amicus curiae.*

BRASWELL, Judge.

[1] On 5 January 1980 plaintiff killed[1] her husband, and in criminal court she pleaded no contest to involuntary manslaughter, a felony. On 20 August 1980, the plaintiff was sentenced to an active term of imprisonment of five years maximum, with no minimum, in the State Department of Correction. Work release privileges were recommended.

After spending approximately 26 days in active confinement at Women's Prison, she was placed on work release status and housed at the North Piedmont Treatment Facility for Women of the State Department of Correction. She was paroled about 1 August 1981. Her attorney in criminal court is the same as in civil court.

The plaintiff is a schoolteacher. By her skills and endeavors she had become well liked, admired and respected in the community. She had in the past been an outstanding tenured, career teacher. The School Board held hearings to determine if she should be discharged from employment as a teacher because of her criminal felony misconduct involving the death of her husband.

The Board, after a second hearing, on remand from the first appeal of plaintiff to Superior Court, entered its order of 14 August 1981 discharging the plaintiff from her teaching position.

---

1. Although plaintiff objected in this emotionally-charged case to the terminology "killed," we perceive that "killed" is supported by the evidence in the record. In her brief plaintiff argues that the death was a tragic accident. We note, however, that in the charging language in the bill of indictment the words "kill and slay" are used. They are the standard for any form of manslaughter, as established by G.S. 15-144. Under the provisions of G.S. 15A-1022(c), the trial judge, before accepting a plea of no contest, must determine (as was done in this case) that there is a factual basis for the plea, and, under Sec. (d) the judge treats the defendant as guilty, whether or not guilt was admitted.

Following plaintiff's appeal, a second hearing was held in Superior Court, with final judgment entered 13 November 1981. Plaintiff appealed on the same day to this Court.

Plaintiff has presented us with eight assignments of error, and defendant has filed six cross-assignments of error. The decision by us of two questions will eliminate the need for independent seriatim discussion of other assignments of error. The first question is whether the Board's findings and conclusions that the conduct of the plaintiff, as set out in the order of 14 August 1981, falls within the statutory grounds for dismissal of a career teacher under former G.S. 115-142(e)(1)k, now codified as G.S. 115C-325(e)(1)k, which reads:

"Any cause which constitutes grounds for the revocation of such career teacher's teaching certificate."

The second question is whether the trial court erred in upholding the dismissal under 16 N.C. Administrative Code, Sec. 2H.0224(a)(3), which provides for dismissal upon:

"Conviction or entry of a plea of *nolo contendere*, as an adult, of a crime; provided, that a certificate shall not be revoked on this basis unless there is a reasonable and adverse relationship between the underlying crime and the continuing ability of the person to perform any of his/her professional functions in an effective manner."

Pertinent paragraphs from the Board's Order reveals the following:

11. That said Teacher was indicted for the crime of voluntary manslaughter arising out of the death of her husband, Reginald Burrow, and that this Board received a certified copy of said indictment for the Randolph County case of *STATE OF NORTH CAROLINA vs. CHERYL MARTIN BURROW*, 80 CVS 110.

12. That the Teacher, on or about July 17, 1980, as a result of a negotiated plea bargain, entered a plea of no contest to the charge of involuntary manslaughter, which plea was accepted by the Court; and that a certified copy of said Transcript of Plea was received by the Board of Education.

13. That, upon said plea, the Judge entered prayer for judgment continued until the August 18, 1980 term of Superior Court, and thereafter on August 20, 1980, sentenced said Teacher to a five years maximum active prison sentence in the Department of Corrections Facilities for Women, with work release recommended; and that a certified copy of said Judgment and Commitment was received by the Board of Education.

14. That, from the evidence of law enforcement officers and from the statement and testimony of the Teacher, on January 5, 1980, without provocation and without being in fear of any physical harm, the Teacher introduced a cocked, loaded firearm into a situation involving her husband, the deceased, and through her gross criminal negligence, and her wanton, careless, and reckless use of said firearm, caused the death of said Reginald Burrow, and was criminally responsible therefor; that although the Teacher offered evidence that she felt that her husband was an alcoholic and refused to discuss this problem with her, there was contrary evidence from the deceased's associates and employer that the deceased did not have an alcoholic problem; that the autopsy report of the deceased indicated that the degree of fatty change in the liver was indicative of chronic alcohol abuse, but that the deceased had a 0.0 percent blood level of ethanol at the time of his death. Nevertheless, the Teacher indicated that she had sought little advice from public or private sources, had not called the sheriff, had made no attempts to commit her husband for treatment, and further indicated in her testimony that as of December of 1980, she saw no other way to resolve her problem other than introducing a firearm into the situation, and had to take numerous conscious steps to retrieve said firearm from its hidden place in the bedroom closet, and holding said firearm for some time while her husband was in the shower and afterward. This conduct on January 5, 1980, was criminally reckless, exhibiting gross disregard for life and safety of a human being. The attitude toward human life expressed by this conduct is not in keeping with and is contrary to the duties and obligations of a teacher engaged in public education in Randolph County.

15. That, pursuant to the Judgment of the Court, the Teacher was imprisoned in the Department of Corrections Facilities for Women in Raleigh, North Carolina, on or about August 20, 1980; thereafter, the Teacher's resignation by September 15, 1980, was requested in a letter to her attorney dated August 29, 1980. In response thereto, on September 15, 1980, the Teacher appeared for class at Randleman Senior High School on "work release" without any notice to school officials by the Teacher or by the Department of Corrections officials, but that the media had been previously notified to "cover" the event of her return. This case has been highly publicized through the efforts of the teacher and her representatives, and has attracted wide-spread newspaper and television coverage throughout the county such that the facts and circumstances of the events of January 5, 1980, including the Teacher's versions of the events have been widely reported. The conduct of the teacher in coming back to the school on September 15, 1980 without giving notice to school officials that she would return was unprofessional conduct, purposefully calculated to embarrass school officials and to force a sudden determination of the teaching status of the Teacher; further that the reactions created by the media events staged by the Teacher have not been in the best interest of public education at Randleman High School or in the Randolph County Administrative Unit and have caused a disruption at the school and in the local administrative unit.

16. That the Teacher was in the custody of the prison system at the Central Prison Facilities for Women from August 20, 1980 until September 16, 1980, and was housed in the North Piedmont Treatment Facility for Women, located on Old Rural Hall, Winston-Salem, North Carolina in the custody of the Department of Corrections until on or about August 1, 1981, at which time she was released on parole. The Teacher now remains under the supervision of the North Carolina Department of Paroles.

17. That this Teacher and any teacher in Randolph County has various professional functions including, but not limited to, (a) teaching subject matter, (b) class discipline, (c) interaction with the fellow staff members and administrative superiors, (d) interaction with parents and community

members, and (e) interaction with and being a role model for students.

18. That there have been no complaints of the Teacher's teaching ability in the past and that there are no charges of inadequate performance lodged against the Teacher in this matter.

19. That, as a result of the Teacher being charged with a felony involving the loss of life, and the consequent plea and sentence rendered by the Court, that said Teacher has lost the respect of the community and of many of her fellow professional educators, and as a result, the performance of her professional functions will be severely impaired; therefore, there exists a reasonable and adverse relationship between this crime of involuntary manslaughter and the ability of this Teacher to perform many of her professional functions.

20. That the Teacher's performance in the area of discipline will be impaired in that she will have challenges to her authority from students who, due to all the publicity surrounding this case and events created at the school, are well aware of the Teacher's criminal case and her incarceration. Some high school students also have the tendency to exploit weaknesses in teachers, and the Teacher will be handicapped seriously if she attempts to discipline students while under the stigma of serving an active sentence or parole following the shooting death of her husband.

21. That the Teacher's teaching performance will be affected and her performance in the area of staff interaction has been and will be adversely affected due to the publicity generated by the Teacher, the doubt that this matter casts on the ability of the other teachers of Randleman High School to be models for the students; and the fact that other teachers at Randleman High have been forced against their will to take public stands either for or against the Teacher. There will be questions that other teachers will have as to the efficacy of the Tenure Act with respect to the dismissal of teachers for inadequate performance or neglect of duty for deeds like missing bus duty or failure to make lesson plans, in light of the circumstances of the case at hand wherein the teacher through her gross and wanton acts was criminally

responsible for the death of another person. Other teachers and especially administrators will have difficulties with the Teacher due to problems with the discipline as set out above, when called upon to assist the Teacher or perform the job for her.

22. That the Teacher's interaction with parents and the community have been and continue to be adversely affected, in that the loss of respect experienced by the Teacher renders it impossible for her to be a model for the children of these parents. Many feel that this Teacher, serving an active sentence with the Department of Corrections after such a serious crime, is not an appropriate person to be a pattern for their children and will not allow their children in the Teacher's classroom. It is further inappropriate by any community standard to allow a teacher on work release from serving a sentence for the crime involved in this case to be allowed to teach and be in the position of being a role model for students and an interactor and advisor to the students and their parents. In addition, the trend in discipline today is away from corporal punishment and towards suspension for disciplinary action. The Teacher, her principal, and the Superintendent will have great difficulty with parents of students who are suspended for misconduct under the Teacher's supervision due to the inconsistency of the school system having a teacher serving an active sentence for a felony in its employ who was not suspended, and at the same time attempting to suspend a student for some type of misbehavior less serious than a felony which would normally justify that type of disciplinary action. In addition, the duties of a teacher in areas beyond the classroom such as in club sponsorship, which will require her exposure to the public, will be met by community disagreement and personal exposure to negative reactions and comments by the public, the total result of which will be an overall loss of support for the school system as a whole.

23. The Teacher's interaction with students will be adversely affected. The school system would be making a grave mistake by condoning the type of conduct and acts for which this Teacher has been charged and sentenced. High school students are at a very impressionable age and cannot

be led to believe that these acts and the distinct lack of judgment shown by the Teacher are proper. Her teaching effectiveness will be particularly impaired if students cannot consider her to be a credible teacher.

24. This Board of Education would be setting an improper precedent in this case by allowing this Teacher to return as a teacher in the Randolph County System following the entry of a no contest plea to a serious felony. It is not in the best interest of the educational process at Randleman High School, or in the Randolph County Public School System. Public education in general will be damaged and the reputation of the System seriously tarnished if the teacher is allowed to return. This would adversely affect the Teacher's ability to perform many of her important professional functions, as well as adversely affect the performance of the system as a whole.

We hold that the Board's evidentiary findings do support its ultimate conclusion of a dismissal under either or both grounds, G.S. 115C-325(e)(1)k and 16 N.C. Administrative Code, Sec. 2H.0224(a)(3). The totality of the recited facts, within paragraphs 11 through 24 of the order do show just cause to constitute grounds for the revocation of the plaintiff's teaching certificate under G.S. 115C-325(e)(1)k.

With the passage of G.S. 15A-1011(a) in 1973, the plea of no contest is equated in the statute with a plea of *nolo contendere.* The Administrative Code specifically relates to dismissal upon the entry of a plea of *nolo contendere* (now by statute synonymous with no contest) as an adult of a crime. The plaintiff is an adult, aged 37. Involuntary manslaughter is a crime. Further, the Code requires in addition "a reasonable and adverse relationship between the underlying crime [of involuntary manslaughter] and the continuing ability of the [plaintiff] to perform any of . . . her professional functions in an effective manner." In paragraph 17 of the Board's order some of the various professional functions of the plaintiff as a teacher are listed. We hold that the totality of the facts in all of paragraphs 11 through 24 do show the reasonable and adverse relationship between the crime of involuntary manslaughter and the plaintiff's continuing ability to perform as a teacher in an effective manner

while on work release or on parole, which was her status during the proceedings below. The facts meet the requirements of the Administrative Code.

[2] Plaintiff contends that she had no notice of the quoted section of the N.C. Administrative Code and no notice that the Board would rely on it; that a 19 June 1980 letter from defendant's counsel to plaintiff's counsel concerning the adoption of and applicability of the Administrative Code led plaintiff to enter her criminal plea; and, in effect, that her counsel would not have pleaded "no contest" if he had had prior knowledge of the Code provision or of the civil consequences of the Board's consideration of same; and that the Board ought to be estopped from applying the Code in this case. We feel the plaintiff fails to make out a *prima facie* case of equitable estoppel. *See Boddie v. Bond*, 154 N.C. 359, 365-66, 70 S.E. 824, 826-27 (1911). The law of this State is contrary to plaintiff's position argued in her brief. The defendant Board is a governmental agency. To estop the Board on the points raised in the brief on this assignment of error while the Board was exercising a governmental and sovereign right might, as the rationale is expressed in *Washington v. McLawhorn*, 237 N.C. 449, 454, 75 S.E. 2d 402, 406 (1953), render helpless the Board "to assert its powers in government." Although *Washington* recognized that a governmental agency may be estopped, it also ruled that any estoppel must "not impair the exercise of the governmental powers of the county." *Id.*

Here, the teacher's reliance was upon her own private attorney and not upon the Board. The record discloses that in addition to plaintiff's concern for her future status as a teacher after entering a plea, she was also concerned about a possible wrongful death action by her deceased husband's parents. Likewise, she answered the criminal trial judge's question under oath that no one had made any further promises or threatened her in any way to cause her to enter her plea. The Board of Education cannot be held responsible for the civil consequences of the plaintiff's free and voluntary plea of no contest entered in the criminal court or for any information or advice which may have been given plaintiff by any agent of the Board of Education. *See Henderson v. Gill, Comr. of Revenue*, 229 N.C. 313, 49 S.E. 2d 754 (1948), a case of alleged misleading and costly state sales tax instructions and advice by a state auditor to plaintiff-taxpayer.

The criteria for judicial review in Superior Court of an order of dismissal by the Board of Education is known as the "whole record" test. *Thompson v. Board of Education*, 292 N.C. 406, 233 S.E. 2d 538 (1977); G.S. 150A-51. From our inspection of the judgment, the trial judge, in both the wording and substance of his findings, did conscientiously apply the recognized standard for review. Also, in keeping with *Thompson*, the record shows that the trial judge considered the report of the Professional Review Committee. After determination and evaluation of the facts, the judgment shows that the trial court's derivative holding was "that the charges brought by the Superintendent based on then G.S. 115-142(e)(1)k (now recodified as G.S. 115C-325(e)(1)k) and the N.C. Administrative Code and the August 14, 1981 Order of the Board of Education are supported by competent, material, and substantial evidence, and that a reasonable and adverse relationship exists between the crime in this particular case, involuntary manslaughter with a deadly weapon, and the teacher's continuing ability to perform many of her important professional functions." The various findings and conclusions which are adverse to plaintiff are fully supported by the whole record test.

Under the whole record test, which is also the test this Court must apply, we hold that the decision to dismiss the plaintiff as a schoolteacher by the Randolph County Board of Education is fully supported by competent, relevant, and substantial evidence in consideration of the entire record as submitted to us. We affirm.

We believe it would serve no useful purpose to discuss each of the details in the orders and final judgment, since they are sufficiently explicit. Plaintiff's other assignments of error we find to be without merit. Because of the result reached here, we deem it unnecessary to reach any of defendant's cross-assignments of error.

In spite of the brevity of this opinion when compared with the quantity of materials submitted for review, we have made a thorough study of the entire record, including its voluminous attachments, exhibits, amicus curiae briefs, and errata.

Affirmed.

Judges HEDRICK and WHICHARD concur.